UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEDRO ALMONTE; HEURY ALMONTE; GENARO ALMONTE; XIOMARA ALMONTE; ANABEL ALMONTE, on behalf of her minor child, C.A.;<br><br>Plaintiffs,<br><br>-against-<br><br>THE CITY OF NEW YORK, DETECTIVE PEDRO ROCHE; JOHN DOES 1–4;<br><br>Defendants. | COMPLAINT<br><br>Case No. 22-cv-2903 _____ |

Plaintiffs, by their attorneys, Rickner PLLC and Glenn A. Garber, P.C, complaining of the Defendants, alleges, upon information, belief, and personal knowledge:

**NATURE OF THE CASE**

1. This is a civil rights action brought against the City of New York and members of the New York City Police Department ("NYPD"), who violated Plaintiffs' rights under the Constitution of the United States.

**JURISDICTION, VENUE, JURY DEMAND**

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the Constitution of the United States. This court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiffs seek redress of violations of their rights guaranteed under the United

States Constitution.

3. Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. 1391(b), because a substantial parts of the events or omissions giving rise to the claims alleged herein occurred in the Southern District of New York.

4. Plaintiffs demand a jury trial for all claims.

## PARTIES

5. Plaintiff Pedro Almonte (hereinafter "Pedro") is, and was at all times relevant to this action, a resident of New York County in the State of New York.

6. Plaintiff Heury Almonte (hereinafter "Heury") is, and was at all times relevant to this action, a resident of New York County in the State of New York.

7. Plaintiff Genaro Almonte (hereinafter "Genaro") is, and was at all times relevant to this action, a resident of New York County in the State of New York.

8. Plaintiff Xiomara Almonte (hereinafter "Xiomara") is, and was at all times relevant to this action, a resident of New York County in the State of New York.

9. Plaintiff Anabel Almonte (hereinafter "Anabel"), appearing on behalf of her minor child, "C.A.", is a resident of the State of Georgia. Pursuant to Fed.R.Civ.P. 5.2(a)(3), C.A. is referred to by her initials to protect her privacy as a legal infant.

10. Defendant the City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department that acts as its agent in the area of law enforcement and for which it is ultimately responsible. It is the municipal entity responsible for the City's police department, and thus is liable for the unconstitutional patterns and practices promulgated by the NYPD.

11. Defendant Detective Pedro Roche (Shield No. 921) (Tax ID 916559) (hereinafter

"Roche") was at all relevant times described herein an NYPD officer, employed by the City of New York. At all relevant times described herein, he was acting under color of New York state law, and acting in the course and scope of his duties. He is sued in his individual capacity for acts and omissions committed under color of law.

12. Defendant Officer Does #1–4 (hereinafter the "Doe Defendants") were at all relevant times described herein NYPD officers employed by the City of New York. At all relevant times described herein, the Doe Defendants were acting under color of New York state law, and acting in the course and scope of their duties attendant to that employment. They are sued in their individual capacity for acts and omissions committed under color of law.

13. The following officers were captured on a cell phone video, and are shown here to assist the City in quickly identifying the Doe Defendants:



14. The true name and shield numbers of the Doe Defendants are not currently known to the Plaintiffs. However, each Doe Defendant is an employee or agent of the NYPD. Accordingly, each is entitled to representation in this action by the New York City Law Department ("Law Department") upon request, pursuant to New York State General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Plaintiffs intend to name said officers as defendants in an amended pleading once the true name and shield numbers are known; and (b) that the Law Department should immediately begin preparing their defense in this action.

15. Collectively, Det. Roche and the Doe Defendants , who, upon information and belief,

are part of the NYPD's Warrant Squad, are referred to as the "Individual Defendants."

16. At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

17. At all relevant times, the Individual Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## THE VIOLATION OF PLAINTIFFS' CIVIL RIGHTS

18. In the early morning hours of April 8, 2019, the Individual Defendants arrived at Plaintiffs' family home and began banging on the door. Plaintiff Huery Almonte—whose family, including Heury's newborn son, brother (Pedro), sister (Anabele), niece (C.A.), and parents (Xiomara and Genaro)—came and opened the door in an effort to deescalate any police interaction.

19. The Individual Defendants immediately rushed into the home and began attacking Pedro, who had been sleeping on the couch, shoving him against the windows and walls while punching him with closed fists.

20. After Pedro's father came in and yelled at the officers to stop, crying out that they were going to kill his son, the Individual Defendants began grabbing, pushing, hitting, and otherwise unlawfully employing unnecessary and excessive force against the rest of the family, including Genaro and Xiomara.

21. The Individual Defendants threw Xiomara onto the bed and then threw C.A., a toddler, on top of her. When Anabel, Xiomara's daughter and C.A.'s mother, returned home, C.A. was crying hysterically and had red marks on her arms from the officers' rough handling of the child.

22. Pedro, who was the target of the raid, pled with the officers to stop hitting his face, explicitly telling them that he suffers from seizures. But the Individual Defendants continued their assault even after Pedro was in handcuffs, hitting him at least twice in the face while he was cuffed inside of the police van, and again attacking him in the holding pen of the precinct.

23. Pedro's arresting officer, Defendant Roche, failed to record this fact in the medical treatment of prisoner ("MTP") form, instead writing that Pedro's only medical complaint was his asthma. Roche also wrongly stated that Pedro refused treatment, despite Pedro asking to be taken to the hospital, where he was eventually taken for treatment.

24. Another officer, however, made a note on Pedro's prisoner profile that Roche knew Pedro suffered from seizures. Pedro was taken to New York Presbyterian Hospital, where he was assessed for his injuries arising from the assault. Since the incident, Pedro has been experiencing seizures with increased frequency, attributable to the Individual Defendants' blows to his head.

25. Genaro was also injured and experienced severe pain to his wrist, while Xiomara experienced aches throughout her body from being thrown onto the bed. C.A. had redness and bruises from the Individual Officers' rough tactics.

26. To cover up their wrongdoing, the Individual Defendants charged Pedro with resisting arrest and obstruction of governmental administration ("OGA"), as well as assault with an intent to injure a police officer, a Class D felony.

27. These false and retaliatory charges against Pedro were ultimately dismissed.

## FIRST CLAIM FOR RELIEF:
## UNREASONABLE SEARCH AND SEIZURE UNDER 42 U.S.C. § 1983
## AGAINST THE INDIVIDUAL DEFENDANTS

28. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

29. The Individual Defendants entered Plaintiffs' home with an arrest warrant for Pedro Almonte, but proceeded to execute the seizure in an unreasonable and unlawful fashion, including tossing the home without a search warrant.

30. Moreover, the officers' uses of force, unnecessary destruction of the Plaintiffs' property, and aggression toward both minor children and elderly adults, rendered the execution of the warrant unreasonable as a matter of law.

31. Each of the Individual Defendants acted in concert in this violation of Plaintiffs' constitutional right to be free from unreasonable searches and seizures.

32. That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth Amendment to the United States Constitution., and Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

33. The Individual Defendants are therefore liable to Plaintiffs for damages under 42 U.S.C. § 1983, including punitive damages.

## SECOND CLAIM FOR RELIEF:
## EXCESSIVE FORCE 42 U.S.C. § 1983
## AGAINST THE INDIVIDUAL DEFENDANTS

34. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

35. The Individual Defendants employed unnecessary and excessive force against each Plaintiff, while inside the family home executing an arrest warrant, and they did so recklessly, maliciously, and with a complete disregard for Plaintiffs' rights.

36. Each of the Individual Defendants acted individually and in concert in this violation of Plaintiffs' constitutional right to be free from unjustified and unreasonable uses of force.

37. That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth Amendment to the United States Constitution., and Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

38. The Individual Defendants are therefore liable to Plaintiffs for damages under 42 U.S.C. § 1983, including punitive damages.

### THIRD CLAIM FOR RELIEF:
### PROSECUTION WITHOUT PROBABLE CAUSE UNDER 42 U.S.C. § 1983
### BY PLAINTIFF PEDRO ALMONTE AGAINST THE INDIVIDUAL DEFENDANTS

39. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

40. The Individual Defendants improperly charged Pedro with three offenses of which he was not guilty in retaliation for the family's protestations during the arrest, and in an effort to cover up their unlawful uses of force and attempt to justify the injuries they caused Plaintiffs.

41. In doing so, the Individual Defendants acted with recklessness, malice, and a complete disregard for Pedro's constitutional rights.

42. Plaintiff was not convicted of these offenses.

43. Each of the Individual Defendants acted individually and in concert in this violation of Plaintiffs' constitutional right to be free from prosecution without probable cause.

44. That by virtue of the aforementioned acts by the Individual Defendants, Plaintiffs were deprived of civil rights guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution., and Plaintiffs were caused to suffer physical, economic, and emotional injuries, as well as deprivations of their liberty.

45. The Individual Defendants are therefore liable to Plaintiffs for damages under 42 U.S.C. § 1983, including punitive damages.

## FOURTH CLAIM FOR RELIEF:
## *MONELL* CLAIMS AGAINST THE CITY OF NEW YORK

46. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

47. The City of New York is liable for the conduct of the Individual Defendants under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) because the driving force behind these constitutional violations were the *de facto* policies and practices of the NYPD, a City agency.

48. The City of New York consistently fails to properly train, supervise, and discipline their officers for flagrant civil and constitutional violations, including unjustified uses of force and unreasonable executions of both search and arrest warrants.

49. Specifically, the NYPD has a pattern and practice of ignoring repeated violations of the Fourth and Fourteenth Amendments by its Warrant Squad(s), intentionally turning a blind eye to or otherwise covering up unreasonable searches and seizures and the uses of excessive force that typically accompany encounters with this unit.

50. Data published by Pro Publica covering CCRB investigations show that, from 2015–2020, the CCRB investigated more misconduct allegations against members of the Warrant Squad

than any other unit, except for the 75th Precinct.[1] The allegations include threatening deadly force, wielding weapons in the faces of civilians, using foul language, and destroying property.

51. Former NYPD Detective Sergeant and instructor at the John Jay College of Criminal Justice has commented that CCRB complaints against the squad is unsurprising, as it is their job to "hunt people" in plainclothes and unmarked cars. *Id*.

52. Nearly half of these CCRB complaints were about unlawful residential intrusions and searches when executing arrest or search warrants. *Id*.

53. The squad has been described as "a shadowy group of plainclothes officers who have been detaining persons of interest in the city for decades," and whose former focus on counterterrorism post-9/11 has devolved into "rounding up persons of interest for the department."[2]

54. While the warrant squad may have been originally imagined to detain highly dangerous fugitives, in actuality it initiates and escalates violence and fear in situations where fugitives are not dangerous, do not threaten violence, and where force is unnecessary and inappropriate. According to Senior Policy Counsel at the Brooklyn Defenders Service, the squad itself creates the conditions that they then use to justify retaliatory tactics and charges: "When a person is accosted by surprise, they have a natural reaction. Someone will run, they'll fight, they'll yank their arms away from someone who's trying to pull them into a car . . . These acts were often charged as resisting arrest or obstructions of governmental administration" — both of which Pedro

---

[1] *See* Joseph, George, "Warrant Squad In Protest Video Has History Of Aggressive Tactics, Previously Secret Data Shows," Gothamist (Aug. 1, 2020), *available at* https://gothamist.com/news/warrant-squad-protest-video-has-history-aggressive-tactics-previously-secret-data-shows.

[2] *See* Burns, Kaitlyn, "The NYPD unit that snatched a protester off the street has been accosting people for years." Vox, Jul. 31, 2020), available at https://www.vox.com/identities/2020/7/31/21348110/nypd-warrant-squad-snatched-nikki-stone-protester.

was charged with following his arrest. *Id*.

55. The high-profile case of a transwoman named Stickers O'Neill (previously known as "Nikki Stone") in the summer of 2020 brought public attention to the rough tactics of the warrant squad, when plainclothes officers sped up near a protest and grabbed Stone without warning, pulling her into an unmarked van and beating her once inside.[3]

56. The incident triggered serious condemnation across the city and country, with Former Governor Cuomo calling Stickers' arrest "disturbing," "obnoxious," "frightening, and "wholly insensitive" to the spirit of the protests against police brutality in the wake of the police murder of George Floyd.[4] Councilwoman Carline Rivera called the warrant squad's actions "a massive overstep," while New York City's Comptroller was quoted as being "deeply concerned" about the arrest tactic."[5]

57. Like Plaintiffs' case, witnesses to the 2020 incident said that the squad fabricated a story about their tactics being justified because the crowd was throwing rocks and bottles at the officers. But in reality, the protestors said that they "turned a corner and were met with a line of police who attacked [] without warning."[6]

58. It is all too common for these warrant squad officers to operate in such an unconstitutional manner with complete impunity. In the case of Ms. O'Neill, former Mayor

---

[3] *Supra* n.1.; *see also* Miller, Ryan W., "New York police officers force protester into unmarked van, video shows: 'NYC is taking after Portland,'" USA Today (Jul. 29, 2020), *available at* https://www.usatoday.com/story/news/nation/2020/07/29/new-york-police-forced-protester-unmarked-van-video/5534010002/.

[4] *See Stone v. City of New York et al.*, Index No. 158812/2021, Doc. 1 at ¶26 (Sup. Ct. N.Y. Co. September 26, 2021) (*citing* "Protester released after controversial arrest in Manhattan; NYC officials demand answers," Eyewitness News, ABC7NY (July 29, 2020), available at https://abc7ny.com/nyc-protest-arrest-nikkistone-manhattan-woman-arrested/6339831/).

[5] *Id*. at ¶28.

[6] *Supra*, n.2.

DeBlasio refused to call for any punishment whatsoever, instead saying he would "discuss" the squad's long-standing tactics with NYPD's Commissioner. *Id*.

59. CCRB data also shows that NYPD officers who repeatedly violate the Fourth Amendment (whether through the use of excessive force or unconstitutional searches and seizures) not only keep their jobs, but many are promoted: Of the 359 police officers known to have violated the Fourth Amendment, the vast majority, 291, were promoted to detective based entirely on purported merit.

60. These substantiated complaints represent the most extreme police misconduct, because CCRB only substantiates complaints when the misconduct is undeniable.

61. Recently, Eastern District of New York Judge Raymond Dearie J. Dearie reviewed multiple unsubstantiated CCRB closing reports for an officer and found that:

> (1) Investigators systematically refuse to credit testimony by civilian witnesses with regards to use of force yet routinely credit uncorroborated statements by the officers. Investigators decline to substantiate allegations, even when they find them to be plausible, whenever the officers deny the offending conduct. … (2) In one-on-one confrontations between an officer and an individual, the standoff is always resolved in favor of the officer. … (3) Investigators reach conclusions that defy common sense and do not logically flow from the investigation's factual record. … (4) The depth of investigation conducted does not match the gravity of the allegations. … [and] (5) Investigators do not consider the officer's complaint history to identify patterns in the officer's behavior.

*Jenkins v. City of New York*, 388 F. Supp. 3d 179, 188-91 (E.D.N.Y. 2019).

62. On November 15, 2020, the New York Times reported that out of 6,900 of the misconduct charges recommended by the Civilian Complaint Review Board, the NYPD leadership reduced the recommended penalty in 71 percent of cases. By far the most common penalty actually imposed for this misconduct is losing a few vacation days.

63. The CCRB has specifically identified scores of incidents in which NYPD officers ignored, misunderstood, or misapplied standards imposed by the Fourth Amendment related to warrantless entries into a person's dwelling.

64. For example, a 2016 New York Times article recounted some of these lawless entries, including one in which the officers proclaimed they could "do anything [they] want" in response to a denial of consent to enter a civilian's home. The officers went on the search the home floor by floor.[7]

65. In a second example, officers who procured an arrest warrant—not a search warrant—barged into a home unannounced at 5:30 a.m., only to find a woman with her child and grandchild inside. The address on the warrant was outdated and incorrect, and it did not provide authority to enter to home to effectuate any arrest. *Id*.

66. Then-chairman of the CCRB, Richard D. Emery, stated that these unlawful entries represented a pattern "that could be avoided" by the Department, noting that such entries are often terrifying and have "terribly serious effects on people who are invaded." *Id*.

67. Even in particularly egregious cases of Fourth Amendment violations, the NYPD refuses to effectively discipline officers. For example, David "Bullethead" Grieco has been the subject of almost three dozen lawsuits, almost all alleging violations of the Fourth Amendment.

68. In one 2020 case, the litigants allege that Grieco and a group of officers "forcefully entered" the Plaintiffs' apartments without consent, arrested its occupants—including a paraplegic man who was subjected to excessive force—and unlawfully searched each apartment in the home.[8]

---

[7] Baker, Al, "Review Agency Faults New York Police Department on Unlawful Searches," The New York Times (Feb. 29, 2016), available at https://www.nytimes.com/2016/03/01/nyregion/new-york-police-faulted-by-agency-for-unlawful-searches.html.

[8] *See Laroc et al v. City of New York et al.*, Case No. 20-cv-5227 (E.D.N.Y.) at Dkt. 1.

On a separate occasion, Grieco burst into a home without a warrant and detained six-year old twins, who he then transported to the precinct.[9] Nonetheless, Grieco was promoted to sergeant in 2018 after making over $190,000 in fiscal year 2017. The City has paid over $600,000 in settlements arising from Grieco's unlawful tactics, yet the NYPD continues to allow Grieco to remain on the force with almost no oversight or discipline whatsoever. In fact, he is elevated in the ranks where he is less likely to be monitored and where he is actually tasked with supervising others.

69. These patterns of unlawful searches and seizures, often conducted with excessive force, are present at every level of the NYPD command, demonstrating that (1) the culture and policies of the NYPD have long failed to protect the Fourth Amendment rights of New Yorkers; and (2) officers who have substantiated complaints regarding violations of the Fourth Amendment have no trouble climbing being promoted in the department, further perpetuating these unconstitutional practices.

70. Chief-of-Crime Control Strategies Michael Lipetri's multiple CCRB complaints include a substantiated complaint from 2015 in which Lipetri, an Inspector at the time, and four other officers barged into a man's home unannounced at 5:00 a.m. where the man and his family members, including two children, were sleeping. Not only was the entry itself unlawful, but the officers also broke into the wrong home. No one bearing the name on the arrest warrant lived in or was present in the apartment. Lipetri received "instructions" and no discipline for the invasion.[10]

---

[9] *See* Offenhartz, Jake, "Here Are NYC's Most Sued Cops Who Are Still On The Job, According To New Public Database," Gothamist (Mar. 7, 2019), available at https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database

[10] Smith, Greg B., "Misconduct Complaints Trailed NYPD Commissioner Shea and Other Police Brass' Rise to the Top," The City (Mar. 22, 2021), available at https://www.thecity.nyc/2021/3/22/22345475/nypd-misconduct-complaints-trailed-shea-police-brass.

71. In August 2003, before Chief of Department Rodney Harrison was promoted, he was a sergeant at the 83rd Precinct in Brooklyn when he and a group of officers stormed the apartment of a mother and her five children with their weapons drawn, claiming that they were searching for the children's father. The CCRB recommended departmental charges, but the NYPD imposed command discipline—which almost always amounts to a loss of vacation days. *Id*.

72. In 2011, Harrison was accused of threatening a tenant with arrest if she did not consent to a search of her son's locked room, who was the intended subject of an unlawful entry into the woman's home. After threatening her into submission, Harrison coerced the woman to write a false letter stating that he had permission to search the locked bedroom. The CCRB charges of an unjustified entry and threat of arrest were substantiated. *Id*.

73. Even ex-NYPD Police Commissioner Dermont F. Shea has at least one substantiated CCRB complaint for violations of the Fourth Amendment on his record, which included an illegal vehicle stop, illegal search of persons, and illegal search of a car. When the CCRB recommended charges, the NYPD instead ordered that Shea and the other involved officer undergo departmental "instructions." *Id*.

74. Because of these practices maintained by the NYPD, the Individual Officers rightly believed that they would not receive any meaningful punishment for violating the Fourth Amendment, nor did they have reason to believe that violating the Fourth Amendment in the course of their duties would in any way impair their chances of being promoted or continuing on to a lengthy and decorated careers in the department.

75. As a result of these unconstitutional policies and practices, Plaintiffs' were deprived of their constitutional rights, and the City of New York is liable under *Monell* for any damages caused by the Individual Defendants, except for punitive damages.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

  a. Compensatory damages;

  b. Punitive damages;

  c. The convening and empaneling of a jury to consider the merits of the claims herein;

  d. Costs and interest and attorney's fees;

  e. Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
   April 8, 2022

Rickner PLLC

By: /s/

Rob Rickner

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401

**Glenn A. Garber, P.C.**

By: /s/

Glenn A. Garber

233 Broadway, Suite 2370
New York, New York 10279
Phone: (212) 965-9370
Fax: (212) 965-9375

*Attorneys for Plaintiffs*